UNITED STATES DISTRICT COURT                    c
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

CAROL SUE GARNER,                   CIVIL ACTION NO. 1:17-CV-01084
Plaintiff

VERSUS                              JUDGE JAMES

U.S. COMMISSIONER SOCIAL            MAGISTRATE JUDGE PEREZ-MONTES
SECURITY ADMINISTRATION,
Defendant

---

## REPORT AND RECOMMENDATION

Carol Sue Garner ("Garner") protectively filed an application for period of
disability and Social Security Disability Insurance Benefits ("DIB") on September 28,
2015.   (Doc. 9-1, pp. 216-217).  Garner also protectively filed an application for
Supplemental Security Income ("SSI") on September 28, 2015.  (Doc. 9-1, pp. 206-
215).  Garner alleged a disability onset date of April 7, 2014, due to depression,
anxiety, post-traumatic stress disorder ("PTSD"), osteoarthritis in all joints, and
sciatica.  (Doc. 9-1, p. 216).  Garner's claims were initially denied by the Social
Security Administration ("SSA") on April 12, 2016, and upon reconsideration on May
12, 2016. (Doc. 9-1, pp. 76-127).[1]

Garner's applications were heard before an administrative law judge ("ALJ")
on October 7, 2016.  (Doc. 9-1, pp. 38-74).  Garner appeared with Elizabeth Ann Allen,
a vocational expert ("VE").  (Doc. 9-1, p. 18).  Garner also appeared with Andrew S.
Youngman, a non-attorney representative of Citizens Disability, LLC, and attorney

---

[1] Garner filed a claim for DIB on May 2, 2014, initially denied on May 27, 2014.  (Doc. 9-1, p.
75).

Gian Barnett, also of Citizens Disability, LLC. (Doc. 9-1, p. 40). The ALJ denied Garner's claim on January 11, 2017. (Doc. 9-1, pp. 15-29). The ALJ determined that Garner was not disabled under the Social Security Act (the "Act"), finding at step five of the sequential evaluation process that she was able to make an adjustment to other work that exists in significant numbers in the national economy. (Doc. 9-1, pp. 28-29).

On June 28, 2017, the Appeals Council denied Garner's request for review, and the ALJ's January 11, 2017 decision became the final decision of the Commissioner of Social Security (the "Commissioner"). (Doc. 9-1, p. 6).

Proceeding *in forma pauperis*, Garner filed this appeal for judicial review of the Commissioner's final decision. (Doc. 1). Garner asserts the findings of the Commissioner are not based upon substantial evidence and that improper legal standards were applied. (Doc. 1). Garner's brief asserts three errors: (1) that the ALJ erred in relying on VE testimony to fulfill his step five burden without properly addressing post-hearing objections to the VE's testimony; (2) that the ALJ erred by failing to analyze the opinion evidence in accordance with the regulations, Agency policy, and Fifth Circuit precedent; and (3) that the ALJ erred by failing to consider Garner's strong work history in her credibility assessment. (Doc. 12).

The Commissioner responded. (Doc. 13). Garner replied. (Doc. 14). Garner's appeal is now before the Court for disposition.

## I.    Summary of Pertinent Facts

### A.    Administrative Hearing

At the October 7, 2016 administrative hearing, Garner testified her date of birth is November 26, 1964. (Doc. 9-1, p. 42). She is right-handed. (Doc. 9-1, p. 42). Garner has been divorced since 2005. (Doc. 9-1, p. 42). She has three adult children. (Doc. 9-1, p. 43). She resides in Anguilla, Mississippi with her boyfriend, her youngest daughter, and her daughter's boyfriend. (Doc. 9-1, p. 43). Garner testified her daughter living with her is mentally impaired and receives disability benefits. (Doc. 9-1, p. 43). Garner stated her boyfriend works. (Doc. 9-1, p. 43).

Garner has a current driver's license. (Doc. 9-1, p. 43). She cannot drive for periods of time. (Doc. 9-1, p. 43). Garner stated that, after driving far, her back hurts and her legs go numb. (Doc. 9-1, pp. 43-44). Garner testified her medical records say her legs go numb because she has sciatica. (Doc. 9-1, p. 44). Garner received her GED and can read and write. (Doc. 9-1, p. 44). She can keep up with money, and knows how much change she should receive back. (Doc. 9-1, p. 44).

Garner's disability onset date was April 7, 2014. (Doc. 9-1, p. 44). She has worked since the onset date of her disability. (Doc. 9-1, p. 44). Garner worked at BB's Kitchen and moved to Anguilla in May of 2015. (Doc. 9-1, pp. 44-45). She moved in with her boyfriend. (Doc. 9-1, p. 45). Garner was a cook, but could not lift pots, stand on her feet, or deal with the public. (Doc. 9-1, p. 45). Garner had income from BB's in the second quarter of 2015 in the amount of $2,647, and from the fourth quarter in the amount of $3,869. (Doc. 9-1, p. 45). Garner also had income from Papa T's

(Taunton's) in Ferriday, and from Hines Grocery. (Doc. 9-1, p. 45). She stated she worked a couple hours per day at Hines when they needed extra help. (Doc. 9-1, p. 45). Garner was a cook and cashier for Papa T's. (Doc. 9-1, p. 46). She worked at Wal-Mart in the deli for a little while. (Doc. 9-1, p. 46). She also worked at Ray's PD, a restaurant. (Doc. 9-1, p. 46). Garner was a transportation officer at the correctional center. (Doc. 9-1, p. 46). She drove the van. (Doc. 9-1, p. 46). Garner worked at a paper company in 2001, making paper bags. (Doc. 9-1, p. 46).

Garner testified she has back issues. (Doc. 9-1, p. 47). She had an X-ray in March of 2016 that showed slight, lower, lumbar facet joint arthropathy with mild spondylithic change. (Doc. 9-1, p. 47). She testified she has pains in her lower back, sciatica, arthritis in her back, major depression with PTSD, and anxiety disorder with homicidal tendencies. (Doc. 9-1, p. 47). Garner testified her PTSD is from past physical abuse. (Doc. 9-1, p. 47).

Garner stated she cannot lift or cook because of her back. She testified it hurts her back and her legs go numb when she stands. (Doc. 9-1, p. 48). For her back, she takes ibuprofen 800 four times a day, and Flexeril three times a day. (Doc. 9-1, p. 48). She testified nothing is being done to fix "it" because she has no insurance and cannot afford a doctor. (Doc. 9-1, p. 48). Garner stated she did not qualify for "Obamacare" because she could not pay the premiums and did not qualify for Medicaid because she does not have small children. (Doc. 9-1, p. 48).

Garner testified she cannot lift big pots but can lift small pots if they are not heavy. (Doc. 9-1, p. 49). She is unable to work currently as she has problems with

4

lifting and standing for long periods of time due to her back.  (Doc. 9-1, p. 49). She testified she would try a job if she was not standing as much. (Doc. 9-1, pp. 49-50).

Garner testified she met her boyfriend online in 2015.  (Doc. 9-1, p. 50).  She testified she does not have a computer and used her cellphone.  (Doc. 9-1, p. 50). Garner moved in with him and moved her daughter there the month before the hearing. (Doc. 9-1, p. 50). Garner testified that, with her depression, she does not want to be around anybody.  (Doc. 9-1, p. 51). She cannot get out of bed on some days. (Doc. 9-1, p. 51).  She stated her medicine makes her sleepy.  (Doc. 9-1, p. 51).  Garner stays to herself.  (Doc. 9-1, p. 51).  She gets nervous and frustrated with anxiety attacks.  (Doc. 9-1, p. 51).  Everything stresses her out, but she does not know why. (Doc. 9-1, p. 51).

Garner treated with Life Health, with the latest visit from July.  (Doc. 9-1, p. 51). Her latest report showed some changes, showing she goes outside at least three times a week, walks around and finds things to do. (Doc. 9-1, p. 51).  Her report noted she is learning how to release stress before becoming stressed.  (Doc. 9-1, p. 51).  She confirmed, as her report showed, her stress is related to family relationships, past family issues, and past relationships. (Doc. 9-1, p. 51).  She testified she had been living with her boyfriend since May 1, 2015.  (Doc. 9-1, p. 52).

Garner testified that her normal day consists of making the bed and normal housework when her boyfriend leaves for work. (Doc. 9-1, p. 52).  She does some housework, then has to sit down. (Doc. 9-1, p. 52).  Garner can dress herself.  (Doc. 9-1, p. 52). She testified her boyfriend drives her to town to get food for the house. (Doc.

5

9-1, p. 52). She cooks for him when he is home. (Doc. 9-1, p. 52). But he normally only eats one a meal a day at work. (Doc. 9-1, p. 52).

Garner testified that it is difficult to get out of bed in the morning four or five days of the week. (Doc. 9-1, p. 53). She also testified that the medications she is currently on have not led to any substantial improvement. (Doc. 9-1, p. 53). Garner stated she is on the medication "because it is the $4 plan." (Doc. 9-1, p. 53). But if she can get approved for insurance or Medicaid, they will put her on what she needs. (Doc. 9-1, p. 53). She sees a counselor once a month and a doctor usually every three to four months. (Doc. 9-1, p. 53). Garner stated she has had severe depression for about ten years. (Doc. 9-1, p. 54). She further testified that in 2014, her onset date, depression had been ongoing for some time. (Doc. 9-1, p. 54).

Garner stated that there are triggers to the PTSD episodes, such as being around someone arguing. (Doc. 9-1, p. 54). She will feel like she can see "him" hitting her, and she will be on the floor in the fetal position. (Doc. 9-1, p. 54). Garner testified she went through that for 24 years. (Doc. 9-1, p. 54). She testified she has had guns and knives pulled on her, and had a shotgun stuck down her throat. (Doc. 9-1, p. 55). When an episode is triggered, it takes her back to that. (Doc. 9-1, p. 55). She testified this has happened to her at work. (Doc. 9-1, p. 55).

With her sciatica and back pain, Garner can only do things for about ten to fifteen minutes before she must sit down. (Doc. 9-1, pp. 55-56). Her back goes weak and starts hurting. (Doc. 9-1, p. 56). The only thing that will stop it is lying flat on her back. (Doc. 9-1, p. 56). Garner has fallen because of her back. (Doc. 9-1, p. 56).

She stated she has fallen down the doorsteps and getting out of the bathtub. (Doc. 9-1, p. 56). Garner treats her arthritis and sciatica pain with ibuprofen 800. (Doc. 9-1, p. 57). She testified she is allergic to codeine. (Doc. 9-1, p. 57). She testified she cannot afford other treatment, such as physical therapy. (Doc. 9-1, p. 57).

Garner stated she was not sure she could stand more than ten or fifteen minutes at a time on any job. (Doc. 9-1, p. 57). Garner further stated that when her legs go numb, she would fall down. (Doc. 9-1, p. 57). As to whether she felt she could do a job without dealing with the public where she could sit for six out of eight hours, Garner stated she normally has to sit a while and lie down a while. (Doc. 9-1, p. 58). Garner testified that sitting does not stop the back pain. (Doc. 9-1, p. 58). She must lie down for a couple of hours for her back. (Doc. 9-1, p. 58).

The VE asked Garner about her past work. (Doc. 9-1, p. 59-60). Garner testified that she was a transportation officer at the correction center. (Doc. 9-1, p. 60). She drove inmates to court or the doctor in a van. (Doc. 9-1, p. 60). She did not manage other drivers or do dispatch. (Doc. 9-1, p. 60). The VE also asked Garner about her deli work at Wal-Mart. (Doc. 9-1, p. 61). Garner testified she sliced meat at the Wal-Mart deli. (Doc. 9-1, p. 61). She did not check out customers. (Doc. 9-1, p. 61).

The VE testified that Garner worked as an assembler, DOT[2] number 706.684-022, SVP of 2, unskilled, light. (Doc. 9-1, p. 61). The VE testified Garner worked as a cook, DOT number 313.361-014, SVP of 7, skilled medium. (Doc. 9-1, p. 61). Garner

---

[2] Dictionary of Occupational Titles.

worked as a deli clerk, DOT number 316.684-014, SVP of 3, semiskilled, light. (Doc. 9-1, p. 62). Garner also worked as a van driver, DOT number 905.663-018, SVP of 3, semiskilled, medium. (Doc. 9-1, p. 62).

The ALJ asked the VE to assume a hypothetical individual with the same age, education, and past work experience as claimant with the following limitations: light work; occasionally climb ladders, ropes and scaffolds, limited to frequent stooping, kneeling, crouching, and crawling; occasionally exposed to workplace hazards such as moving mechanical parts and high exposed places; work in a low-stress work environment, defined as simple and routine tasks with no inflexible or fast-paced production requirements such as assembly line work and no more than occasional changes in work setting; can tolerate occasional interaction with the public and occasional interaction with coworkers; and can accept instructions and respond appropriately to supervisors with interaction occurring one or two times throughout the workday. (Doc. 9-1, p. 62-63). The ALJ asked the VE if, based on those limitations, whether any of the past work was available. (Doc. 9-1, p. 63).

Regarding the ALJ's hypothetical, the VE testified there was no past work available to that individual. (Doc. 9-1, p. 63). The VE testified there are other jobs in the national economy such a person could perform. (Doc. 9-1, p. 63). The VE testified that the individual with such limitations could work as a cleaner, housekeeping, DOT number 323.687-014, SVP of 2, unskilled, light (929,540 jobs in the national economy). (Doc. 9-1, p. 63). The VE further testified the individual could work as a bakery racker, DOT number 524.687-018, SVP of 1, unskilled, light (420,520 jobs in

the national economy).  (Doc. 9-1, p. 63).  The VE testified the individual could work as a mail clerk, DOT number 209.687-026, SVP of 2, unskilled, light (99,190 jobs in the national economy). (Doc. 9-1, p. 63).

The ALJ asked the VE to assume medical conditions, pain, and mental impairments caused the person to miss work four days per month.  (Doc. 9-1, p. 63). The VE testified that those factors would eliminate competitive employment. (Doc. 9-1, p. 63).  The ALJ also asked the VE to assume that work must allow the individual to be off task 20% of the workday in addition to regular breaks.  (Doc. 9-1, p. 63).  The VE testified those factors also eliminate competitive employment. (Doc. 9-1, p. 64).

Garner's counsel asked the VE to assume, in addition to the court's assumptions of four absences even during the probationary period and 20% off task, that there would be a need for frequent breaks in addition to those normally afforded. (Doc. 9-1, p. 64-65).  The VE testified that such assumptions would rule out competitive employment. (Doc. 9-1, p. 65).  Garner's counsel defined frequent breaks as no less than two additional breaks each morning and two additional breaks each afternoon, lasting no less than ten minutes. (Doc. 9-1, p. 65).  The VE testified her answer would be the same. (Doc. 9-1, p. 65).

The VE testified that there are 8,390 jobs available in the local economy for the housekeeper job.  The VE acknowledged that conditions of the housekeeper job – standing, pulling, twisting, lifting – could vary from room to room.  (Doc. 9-1, pp. 66-67).  The VE acknowledged that the housekeeper job afforded more discretion than lower level jobs but requires standing possibly more than ten to fifteen minutes at a

time. (Doc. 9-1, p. 67).  Garner's counsel asked the VE to assume an individual, in addition to the court's hypothetical and all prior assumptions, could not stand for more than fifteen minutes at a time.  (Doc. 9-1, p. 67).  The VE testified that the individual would not be able to perform any of the available jobs she provided with those limitations.  (Doc. 9-1, p. 67).

Outside of the previous assumptions, Garner's counsel asked the VE to assume that the hypothetical individual had more than one episode of PTSD during the probationary period.  (Doc. 9-1, p. 68).  Garner's counsel clarified that the PTSD episode resulted in the individual being in the fetal position and whether the jobs offered would accommodate such limitation. (Doc. 9-1, p. 68). The VE testified that the answer was no. (Doc. 9-1, p. 69).

The VE testified she has not placed anyone in the other jobs offered in the last two years, and has not analyzed these jobs during research or labor market surveys in the last couple of years. (Doc. 9-1, p. 69).  The VE used OccuBrowse to derive incidents data, which comes from the Census Bureau.  (Doc. 9-1, p. 70).  The VE testified she is not actively engaged in any labor market research. (Doc. 9-1, p. 70). She also confirmed the DOT titles of the jobs provided were last updated in 1991, and that her software was last updated in 2016.  (Doc. 9-1, p. 70).  Garner's counsel objected to the incident statements offered and jobs available based on that incidents data. (Doc. 9-1, p. 7).  Garner's counsel stated there were no other documents or evidence to add to her file.  (Doc. 9-1, p. 71).

Using the first hypothetical, the ALJ asked the VE whether that individual would have any transferable skills from the past employment that would transfer to sedentary. (Doc. 9-1, p. 71). The VE testified there were none. (Doc. 9-1, pp. 71-72). The ALJ also asked the VE whether there are any conflicts between the DOT requirements and the hypothetical limitations given. (Doc. 9-1, p. 72). The VE testified that the stress level and the occasional interaction conflict with the DOT requirements. (Doc. 9-1, p. 72). She testified that interaction is not addressed by the DOT. (Doc. 9-1, p. 72).

## B.    ALJ's Findings

To determine disability, the ALJ applied the five-step sequential process outlined in 20 C.F.R. § 404.1520(a) and 416.920. The sequential process required the ALJ to determine whether Garner: (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in Appendix 1; (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means the claimant bears the burden of

proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. See Greenspan, 38 F.3d at 237.

In this case, the ALJ found Garner met the insured status requirements of the Act through December 31, 2017. (Doc. 9-1, p. 20). The ALJ found that Garner had not engaged in substantial gainful activity since April 7, 2014, the alleged onset date. (Doc. 9-1, p. 20). In step two and three of the sequential evaluation, the ALJ determined Garner suffered severe impairments of degenerative disc disease, osteoarthritis, sciatica, affective disorders (depression), and anxiety disorders. (Doc. 9-1, p. 21). But the ALJ concluded Garner did not have an impairment or combination of impairments severe enough to meet or medically equal the severity of any of the listed impairments in Appendix 1. (Doc. 9-1, p. 23).

After consideration of the record, the ALJ determined Garner retained the RFC to perform light work, except she was limited to occasionally climbing ladders, ropes, or scaffolds, and frequently stooping, kneeling, crouching, or crawling. (Doc. 9-1, p. 24). The ALJ found Garner was limited to occasional exposure to workplace hazards such as moving mechanical parts and high, exposed places. (Doc. 9-1, p. 24). The ALJ determined Garner could work in a low stress work environment, defined as simple and routine tasks, no inflexible or fast-paced production requirements (such as assembly line work), and no more than occasional interaction with coworkers. (Doc. 9-1, p. 24). The ALJ also found Garner could tolerate occasional interaction with the public, and occasional interaction with coworkers. (Doc. 9-1, p. 24). The ALJ

determined Garner could accept instructions and respond appropriately to supervisors, where this interaction occurred one or two times per workday. (Doc. 9-1, p. 24).

The ALJ concluded Garner's RFC precluded her from performing past relevant work. (Doc. 9-1, p. 27). The ALJ found Garner was approaching advanced age at age 52 years, with a high school education and the abiliity to communicate in English. (Doc. 9-1, p. 27). Transferability of job skills was not material to the ALJ's determination of disability because he found that using the Medical-Vocational Rules as a framework supported a finding that Garner was "not disabled." (Doc. 9-1, p. 28).

The ALJ also determined that, considering Garner's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Garner could perform. (Doc. 9-1, p. 28). The ALJ had the VE testify regarding jobs with Garner's age, education, work experience, and RFC. (Doc. 9-1, p. 28). The VE testified that given all the factors, the individual would be able to perform the requirements of representative occupations such as cleaner housekeeping, DOT#323.687-014, unskilled, light work with 920,540 jobs nationally, baker racker, DOT#524.687-018, unskilled, light work with 420,520 jobs nationally; and mail clerk, DOT#209.687-026, unskilled, light work with 99,190 jobs nationally. (Doc. 9-1, p. 28). The ALJ found that under Social Security Ruling ("SSR") 00-04p, the VE's testimony was consistent with the information contained in the Dictionary of Occupational Titles, and Garner could make a successful adjustment to other work that exists in significant numbers in the national economy. (Doc. 9-1, p. 28). The

ALJ concluded that Garner had not been under a disability, as defined in the Act, from April 7, 2014, through the date of his decision. (Doc. 9-1, pp. 28-29).

II.   <u>Law and Analysis</u>

    A.   <u>Scope of Review</u>

In considering Social Security appeals, the Court is limited by 42 U.S.C. § 405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. <u>See</u> <u>McQueen v. Apfel</u>, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. <u>See</u> <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. <u>See</u> <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. <u>See</u> <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. <u>See</u> <u>Allen v. Schweiker</u>, 642 F.2d 799, 801 (5th Cir. 1981); <u>see also</u> <u>Anthony v. Sullivan</u>, 954 F.2d 289, 295 (5th

Cir. 1992). The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. See <u>Dellolio</u>, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." See <u>Johnson v. Bowen</u>, 864 F.2d 340 (5th Cir. 1988); <u>Dellolio</u>, 705 F.2d at 125.

**B.     <u>The ALJ properly relied on the VE's testimony at Step 5 of the sequential evaluation.</u>**

Garner asserts the ALJ failed to consider all evidence in the record and failed to rule upon her post-hearing objections to the VE's testimony. (Doc. 12). Garner argues the ALJ generally discussed the objections but did not acknowledge or discuss rebuttal evidence and did not address the inconsistency raised between the DOT and the VE testimony. (Doc. 12). Garner suggests the ALJ should have required the VE to explain the issues raised in their post-hearing objections memorandum. (Doc. 12).

Garner asserts the ALJ's error was not harmless. (Doc. 12). Garner submitted rebuttal evidence consisting of a vocational report and curriculum vitae of vocational expert Paula Santagati ("Santagati"), a vocational rehabilitation counselor. (Docs. 12; 9-1, p. 352-376). Garner contends Santagati opined that the limitation to occasional interaction with coworkers and supervisors presented to the VE at the hearing "precludes all work," as the probationary and training period for any job would require more than occasional interaction. (Doc. 12). Garner claims this evidence directly contradicts the testifying VE's opinion that Garner can perform "other work" in the national economy based on the ALJ's RFC. (Doc. 12).

15

Garner argues the ALJ failed to acknowledge this evidence and failed to resolve the conflicts in vocational evidence raised in the record. (Doc. 12).  Garner further contends the ALJ failed to address her objections showing that two of the positions relied on at step 5 exceed the RFC finding, specifically:  (1) that an SVP 3 level (i.e. semi-skilled work) required for a mail clerk and the limitation to simple and routine tasks; and (2) that a cleaner housekeeper was shown at times to perform at the heavy exertional level, not light work, as the ALJ found. (Doc. 12).  Garner asserts the ALJ committed harmful error by failing to address Santagati's rebuttal evidence in his decision. (Doc. 12).  Garner asserts the Hearings, Appeals, and Litigation Manual ("HALLEX") §§ I-2-6-74 and I-2-5-30(B) require the ALJ to rule on Garner's objections and provide her an opportunity to present rebuttal evidence. (Doc. 12).

The Social Security hearing procedures do not specifically provide for a post-hearing brief. See 20 C.F.R. §§ 404.944, *et seq.*; see also Carter v. U.S. Commissioner of Soc. Sec., 1:15-CV-02850, 2017 WL 1304428 (W.D. La. Feb. 27, 2017), report and recommendation adopted, 1:15-CV-02850, 2017 WL 1332722 (W.D. La. Apr. 4, 2017). Here, Garner's hearing was on October 7, 2016.  (Doc. 9-1, pp. 38-74).  Counsel for Garner noted an objection regarding the incidents statements offered by the VE and the representative jobs provided based on that incidents data. (Doc. 9-1, p. 70).  The ALJ asked Garner's counsel whether they have been given all the time they need to develop the evidence, to which he replied they have.  (Doc. 9-1, p. 71).  However, Garner's counsel asked the ALJ for thirty days to file a post-hearing memorandum. (9-1, p. 71).  Garner's counsel indicated they had no additional evidence to add to the

file. (Doc. 9-1, p. 71). The ALJ granted Gardner seven days for the post-hearing brief. (Doc. 9-1, p. 71).

In his findings, contrary to Garner's assertion that the ALJ failed to address her objections, the ALJ rejected Garner's objections, stating that the Garner's objections to the VE testimony are overruled. (Doc. 9-1, p. 18). The ALJ denied Garner's post-hearing request for a supplemental hearing, stating "no reason requiring the scheduling of a supplemental hearing has been raised, and the representative's citation to Hallex I-2-6-56 is unavailing." (Doc. 9-1, p. 18). The ALJ noted that Garner's representative, in his prehearing memorandum, requested that the record remain open for 30 days after the hearing to submit a post-hearing memorandum. (Doc. 9-1, p. 25). The ALJ stated he agreed at the hearing to hold the record open for seven days for Garner's post-hearing memorandum. (Doc. 9-1, p. 25). The ALJ noted that on October 18, 2016 (11 days post-hearing), Garner submitted a 25-page memorandum, which the ALJ noted was not from the representative that appeared with Garner at the hearing. (Doc. 9-1, p. 25). The ALJ noted the memorandum contained several objections and requested a supplemental hearing. (Doc. 9-1, p. 25).

In overruling Garner's objections, the ALJ stated that the objections raised contained mostly boilerplate language. (Doc. 9-1, p. 25). The ALJ denied Garner's request for a supplemental hearing. (Doc. 9-1, p. 25). The ALJ stated the objections were not timely. (Doc. 9-1, p. 25). The ALJ found that Garner's representative had a full and fair opportunity to cross-examine the VE at the hearing, and that nothing

17

precluded him from doing so regarding the matters raised in Garner's post-hearing memorandum. (Doc. 9-1, p. 25).

The ALJ further discussed that specific objections made at the hearing were noted for the record, and the opportunity to raise any issue and develop all evidence was allowed. (Doc. 9-1, p. 25). The ALJ noted that Garner's representative at the hearing stated they had been given adequate time for all evidence to be developed. (Doc. 9-1, p. 25). The ALJ further found that Garner's post-hearing memorandum raised new issues and contained new objections concerning matters that could and should have been addressed at hearing. (Doc. 9-1, p. 25). Citing to HALLEX I-2-6-56, the ALJ stated that he must base his decision on "evidence adduced at the hearing." (Doc. 9-1, p. 25). Additionally, the ALJ noted that a supplemental hearing is inappropriate when, as in this case, it is requested for addressing matters that could and should have been addressed at the hearing. (Doc. 9-1, pp. 25-26).

Regardless, the ALJ discussed Garner's objections concerning the VE's testimony. (Doc. 9-1, p. 26). The ALJ noted his discretion to use VE testimony, which is endorsed by the Social Security Regulations and Rulings. (Doc. 9-1, p. 26). The ALJ noted that VEs may rely on a number of sources, including DOT, citing 20 C.F.R. §§ 404.1566, 416.966. (Doc. 9-1, p. 26). The ALJ pointed out that the Regulations do not entertain that a VE must also be a statistician or that his or her work product must be made available for the scrutiny of the claimant. (Doc. 9-1, p. 26).

Even assuming the ALJ erred in failing to address Garner's objections, which the record shows he did not, such error would have been harmless. Although

18

HALLEX § I-2-6-74(B) requires that an ALJ rule on objections during the hearing, in a separate exhibit, or in the ALJ's written decision, courts may not reverse and remand for failure to comply with these internal procedures without first considering whether the error was harmless. See Frank v. Barnhart, 326 F.3d 618, 622 (5th Cir. 2003); accord Newton, 209 F.3d at 459 (reversal is warranted if prejudice results from an ALJ's failure to follow HALLEX). Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. Frank, 326 F.3d at 622; Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (error is harmless unless there is no reason to think that a remand might lead to a different result).

The ALJ determined that, in accordance with Social Security Ruling 00-4p, the VE's testimony was consistent with the information contained in the DOT and other accepted sources. (Doc. 9-1, p. 26). The ALJ found that the VE provided adequate testimony at the hearing regarding the sources of information she provided, which he found acceptable within the regulations. (Doc. 9-1, p. 26). The ALJ further found that the VE adequately resolved any discrepancies between her testimony and these acceptable sources, to include any testimony regarding a "sit/stand option," transferrable skills, and any other issues specific to jobs available in sufficient numbers within Garner's RFC, as applicable. (Doc. 9-1, pp. 26-27). The ALJ held that Garner failed to produce any compelling argument or evidence requiring further consideration of these issues. (Doc. 9-1, p. 27).

At step five of the sequential process, the Commissioner bears the burden of proof establishing the claimant can perform work existing in significant numbers in the national economy.  20 C.F.R. § 404.1560(c).  The use of a VE is discretionary.  <u>See</u> 20 C.F.R. § 404.1566(e).  If, however, the claimant suffers from nonexertional impairments, the Commissioner must rely on a VE to establish that suitable jobs exist in the economy.  <u>Newton v. Apfel</u>, 209 F.3d 448, 458 (5th Cir. 2000).

Here, the VE used OccuBrowse to derive incidents data, which comes from the Census Bureau.  (Doc. 9-1, p. 70).  20 C.F.R. § 404.1566(d) specifically provides the following:

> (d) Administrative notice of job data. When we determine that unskilled, sedentary, light, and medium jobs exist in the national economy (in significant numbers either in the region where you live or in several regions of the country), we will take administrative notice of reliable job information available from various governmental and other publications. For example, we will take notice of—
>
> (1) Dictionary of Occupational Titles, published by the Department of Labor;
> (2) County Business Patterns, published by the Bureau of the Census;
> (3) Census Reports, also published by the Bureau of the Census;
> (4) Occupational Analyses, prepared for the Social Security Administration by various State employment agencies; and
> (5) Occupational Outlook Handbook, published by the Bureau of Labor Statistics.

20 C.F.R. § 404.1566(d). Thus, the VE relied on numbers from an accepted source. The Regulations explicitly allow the ALJ to use the DOT. <u>See</u> 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2).  Use of the DOT is typical in Social Security cases. <u>Gillespie v. Astrue</u>, No. 1:13-CV000219, 2014 WL 1168872, at *11 (W.D. La. Mar. 21, 2014).

Moreover, when there is a conflict between the VE's testimony and the DOT, the Fifth Circuit has adopted a "middle ground" approach, which allows the ALJ to rely upon the VE testimony if the record reflects an adequate basis for deviating from the DOT. Carey v. Apfel, 230 F.3d 131, 147 (5th Cir. 2000). The court in Carey stated that "neither the DOT nor the vocational expert testimony is per se controlling, [which] permits a more straightforward approach to the pertinent issue, which is whether there is substantial evidence supporting the Commissioner's determination that this particular person can do this particular job or group of jobs." Id. at 147. While the court noted that a VE's erroneous classification of the exertional level or skills required for a particular job could call into question the reliability of such testimony, the court further stated:

> [C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.

Id. at 146–47.

The ALJ asked the VE whether there are any conflicts between the DOT requirements and the hypothetical limitations given. (Doc. 9-1, p. 72). The VE testified that the stress level and the occasional interaction conflict with the DOT requirements. (Doc. 9-1, p. 72). She testified that interaction is not addressed by the DOT. (Doc. 9-1, p. 72). Garner asserts the rebuttal evidence of Santagati directly contradicts the VE's opinion Garner can perform "other work" in the national economy. (Docs. 12, 9-1, p. 364). Yet, the opinion of Santagati is dated October 1,

2015.[3]  (Doc. 9-1, p. 375).  Garner had the opportunity to address this conflict at the hearing, and the ALJ gave her the opportunity to do so.  Yet, counsel for Garner indicated there was no additional evidence and asked no additional questions to develop this issue. Instead, counsel for Garner noted an objection to the incidents data and requested post-hearing briefing.

Because the record shows an adequate basis to support the ALJ's decision to defer to the expertise of the VE, Garner's first assignment of error lacks merit.

### C.  <u>The ALJ's determination of Garner's RFC was proper.</u>

Garner asserts the ALJ erred by failing to analyze the opinion evidence in accordance with the regulations, Agency policy, and Fifth Circuit precedent.  (Doc. 12).  Garner asserts that Fifth Circuit precedent requires the ALJ to consider each of the requirements of 20 C.F.R. § 404.1527(c) before declining to give any weight to the opinions of the claimants treating specialist. (Doc. 12).  Garner argues that the ALJ failed to provide the requisite good cause for rejecting the medical opinion of Laverne Coleman ("Coleman"), a social worker she alleges was a treating source.  (Doc. 12).  Garner asserts the limitations described by Coleman are greater than those in the ALJ's RFC finding, and are consistent only with a finding of "disabled." (Doc. 12).

Garner claims the ALJ failed to address the Agency's preference for the opinions of examining sources.  (Doc. 12).  Garner argues that SSR 06-03p states that the opinion of a nonacceptable source may be given greater weight than an acceptable

---

[3] Notably, Santagati's vocational opinion is generic form opinion as to "occasional interaction with coworkers and supervisors" and makes no reference to Garner.  (Doc. 9-1, p. 374).  The opinion also fails to address the specific jobs identified by the VE that Garner could perform in the national economy. (Doc. 9-1, p. 374).

source if, like in Garner's case, she has a longitudinal relationship of treatment with the claimant. (Doc. 12).  Garner contends that an RFC that does not accurately depict all the claimant's impairments is contrary to law.  (Doc. 12).  Garner claims since the RFC is inaccurate, the vocational testimony premised upon that RFC cannot be substantial evidence supported the ALJ's denial. (Doc. 12).

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ's RFC decision can be supported by substantial evidence even if the ALJ does not specifically discuss all the evidence that supports his or her decision or all the evidence that he or she rejected. Falco, 27 F.3d at 163-64.  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. Johnson, 864 F.2d at 343; Leggett v. Chater, 67 F.3d 558, 564 (5th Cir. 1995).  The court "may only scrutinize the record" and consider whatever fairly detracts from the substantiality of the evidence supporting the ALJ's decision. Leggett, 67 F.3d at 564. Accordingly, a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or no contrary medical findings to support the ALJ's decision. Johnson, 864 F.2d at 343-44.

Because the treating physician is most familiar with the claimant's impairments, his opinion should be accorded great weight in determining disability. See Giles v. Astrue, 433 Fed. Appx. 241, 246–47 (5th Cir. 2011) (citing Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000)).  If a treating physician's opinion is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight." See Giles, 433 Fed. Appx. at 246-47 (citing 20 C.F.R. § 404.1527(d)(2)). Likewise, when a treating physician has reasonable knowledge of the impairment, his opinion is given more weight than an opinion from a non-treating physician. See id. By contrast, the Commissioner may give less weight to a treating physician's opinion about a condition outside his area of expertise. See id. Treating physicians' opinions also receive greater weight "[w]hen the treating source has seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment." See id.

An ALJ "may reject the opinion of the treating physician *only* if the ALJ performs a *detailed analysis* of the treating physician's views under" the factors set out in 20 C.F.R. 404.1527 and 416.972. See Beasley v. Barnhart, 191 Fed. Appx. 331 (5th. Cir. 2006) (emphasis in original); see also Giles, 433 Fed. Appx. at 246. Under the regulations, an ALJ is required to consider the physician's length of treatment of the claimant, the physician's frequency of examination, the nature and extent of the treatment relationship, the support of the physician's opinion that is afforded by the medical evidence of record, the consistency of the opinion with the medical record, and finally, the physician's specialization. See Newton, 209 F.3d at 456; 20 C.F.R. § 404.1527(c); 20 C.F.R. § 416.927(c).

The ALJ noted claimant was seen for an intake assessment by Life Help Mental Health Services ("Life Help") on June 17, 2015. (Doc. 9-1, p. 21). She was

noted to have mild to moderate depression, panic disorder, and PTSD. (Doc. 9-1, p. 21). She reported no history of outpatient mental health treatment. (Doc. 9-1, p. 21). She had no depressed mood or affect, and her concentration, attention span, and memory appeared to be within normal limits. (Doc. 9-1, p. 21). She had fair judgment and insight. (Doc. 9-1, p. 21). She was diagnosed with major depressive disorder, single episode, and mild and generalized anxiety disorder. (Doc. 9-1, p. 21). The ALJ further discussed her treatment with Life Help on three other visits in 2015, showing her response to treatment was stable. (Doc. 9-1, p. 21).

On May 10, 2016, Coleman saw Garner for a thirty-minute therapy session at Life Help Mental Health Services. (Doc. 9-1, p. 419). Coleman noted Garner's general appearance was within normal limits, with a cooperative attitude and appropriate eye contact. (Doc. 9-1, p. 419). Motor activity, speech, thought content and process, perception, orientation, and appetite were all noted to be within normal limits. (Doc. 9-1, p. 419). Garner had no suicidal or homicidal thoughts but showed a depressed and anxious mood. (Doc. 901, p. 419). Coleman noted Garner had shown some changes but continued to wonder and worry due to lack of income, social outlet, and family stressor. (Doc. 9-1, p. 419).

On July 20, 2016, Coleman saw Garner for what appears to be her last thirty-minute therapy session (Doc. 9-1, p. 453). Coleman noted Garner stated she wanted to get back on her medication. (Doc. 9-1, p. 452). Garner reported some changes, stating that she has at least three times a week gone outside to walk around and find things to do. (Doc. 9-1, p. 452). Garner reported she is learning how to release stress

prior to becoming stressed, attributing most of her stress to family issues and her past relationship. (Doc. 9-1, p. 452). Garner stated: "I'm working on myself." (Doc. 9-1, p. 452). Coleman noted she told Garner to keep up the good work and she looked forward to progress. (Doc. 9-1, p. 452). Coleman assessed Garner's general appearance as within normal limits, with a cooperative attitude. (Doc. 9-1, p. 452). Her motor activity was agitated, but speech, thought content, thought process, perception, appetite, and orientation were within normal limits. (Doc. 9-1, p. 452). Garner exhibited no suicidal or homicidal thoughts. (Doc. 9-1, p. 452). Her mood was irritable. (Doc. 9-1, p. 453). Coleman found Garner to be doing better as far as getting out and being active at home. (Doc. 9-1, p. 453). Coleman also noted Garner was working on her depression and staying away from people who stress her. (Doc. 9-1, p. 453). Coleman's plan of care involved Garner working on her next visit to reduce stress while managing her depression also with medications. (Doc. 9-1, p. 453). Intervention for her depression and anxiety would consist of medication and problem solving counseling, with follow-up every three to four months as needed. (Doc. 9-1, p. 454).

On August 9, 2016, less than a month after Garner's last therapy session, Coleman completed a mental health questionnaire regarding Garner. (Doc. 9-1, p. 481). She listed Garner's diagnosis as Major Depressive Disorder. (Doc. 9-1, p. 481). Coleman noted Garner's symptoms included appetite disturbance, sleep disturbance, decreased energy, inflated self-esteem, easy distractibility, involvement in activities with a high probability of painful consequences which are not recognized, and

generalized persistent anxiety. (Doc. 9-1, p. 481). Coleman also noted symptoms of emotional lability, irritability, social withdrawal or isolations, and a flat affect. (Doc. 9-1, p. 482). Coleman noted Garner stated her problems started since the 1990s. (Doc. 9-1, p. 482). Coleman assessed the following functional limitations due to Garner's mental disorder: mild restriction of activities of daily living; extreme difficulties in maintaining social functioning and in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere); and marked episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw. (Doc. 9-1, p. 483).

The ALJ also considered her September 6, 2016 treatment with Life Help, which showed normal thought, perception, orientation, concentration, attention span, and memory. (Doc. 9-1, p. 22). Her mood was anxious, and her affect was restricted. (Doc. 9-1, pp. 22-23). Her sleep had increased, and her Celexa prescription was decreased. (Doc. 9-1, p. 23). She showed a stable response to treatment. (Doc. 9-1, p. 23).

The ALJ gave partial weight to Coleman, as she was a treating source and he found her opinion was not supported by adequate explanation. (Doc. 9-1, p. 27). The ALJ noted that Coleman indicated Garner had mild restriction of activities of daily living; extreme difficulties in maintaining social functioning and deficiencies of concentration, persistence, or pace; and marked episodes of deterioration or decompensation in work or work-like settings. (Doc. 9-1, p. 27). The ALJ stated that if Garner's condition is as severe as Coleman claims, "seemingly, she would have

recommended some form of in-patient treatment." (Doc. 9-1, p. 27).[4]  The ALJ noted that Coleman is not an acceptable medical source, but rather another source opinion, citing 20 C.F.R. 416.913(a) and 404.1513(a).  (Doc. 9-1, p. 27).

Here, the ALJ correctly noted that Coleman, a social worker, is not an acceptable medical source. 20 C.F.R. § 404.1502(a).  Although the opinion of a claimant's treating physician generally deserves "considerable weight in determining disability," this is not so when the physician's testimony is "brief and conclusory ... or otherwise unsupported by the evidence." Perez v. Barnhart, 415 F.3d 457, 465–66 (5th Cir. 2005) (quoting Greenspan, 38 F.3d at 237). The Fifth Circuit has previously characterized responses to a "'questionnaire' format" as "typi[cally] 'brief or conclusory' testimony" and declined to accord these responses controlling weight when they lack "explanatory notes" or "supporting objective tests and examinations." Foster v. Astrue, 410 Fed.Appx. 831, 833 (5th Cir. 2011).  The questionnaire format used by Coleman typifies "brief or conclusory" testimony that the Fifth Circuit has declined to afford controlling weight.

Moreover, the Fifth Circuit has recognized that an ALJ "is not required to give controlling weight to a treating physician opinion when that opinion is contradicted by examining physician evidence." Walker v. Barnhart, 158 Fed.Appx. 534, 535 (5th Cir. 2005) (quoting Newton, 209 F.3d at 458).  The Fifth Circuit does not require consideration of each of the six factors set out in Newton when "'there is competing

---

[4] It is well established in the Fifth Circuit, as well as other Circuits, that the ALJ is not precluded from relying upon the lack of treatment as an indication of nondisability. Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990).

first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another.'" Id.

Dr. Michael Whelan, a psychologist, performed a consultative mental status examination of Garner on February 17, 2016. (Doc. 9-1, p. 414). Garner stated she has a bulging disc as a result of a car accident and lower back pain. (Doc. 9-1, p. 414). Garner stated she could not stand to cook on her leg all day due to radiating pain and numbness in her right leg. (Doc. 9-1, p. 414). She stated she could not continue to work as a cook due to her physical problems. (Doc. 9-1, p. 414). Garner also reported she would get irritated and upset secondary to pain, easily frustrated and aggravated, and would walk off from work to avoid acting out. (Doc. 9-1, p. 414).

Garner reported to Dr. Whelan she takes Flexeril for muscle spasms, and Celexa and Wellbutrin for depression. (Doc. 9-1, p. 414). She indicated her depression began before her neck and back pain, due to prior physical and emotional abuse over twenty-four years with her ex-husband. (Doc. 9-1, p. 414).

Garner reported her activities of daily living include housekeeping (when she can), lying on the couch so her neck and back will not hurt, and occasionally going to church. (Doc. 9-1, p. 415). She can still drive a car and is competent to manage money despite poor concentration. (Doc. 9-1, p. 415). Dr. Whelan found Garner was able to total six quarters correctly, repeat five digits forward and three in reverse correctly. (Doc. 9-1, p. 416). Garner was unable to do serial sevens. (Doc. 9-1, p. 416).

Dr. Whelan opined Garner has depressive disorder, which initially was a persistent depressive disorder. (Doc. 9-1, p. 416). Dr. Whelan opined Garner may

have had some moderately severe major depressive episodes during tumultuous years of her first marriage. (Doc. 9-1, p. 416).  Now, he felt her depression is secondary to physical pain and physical discomfort.  (Doc. 9-1, p. 416).  Dr. Whelan stated Garner would need treatment for depression until she gets pain relief.  (Doc. 9-1, p. 416).  He noted her mood was not severely depressed during the exam, although she gave a legitimate history suggesting she probably has chronic depression of mild to moderate severity. (Doc. 9-1, p. 416).  Dr. Whelan opined Garner's primary limitations appear to be her physical problems, though her concentration is not good due to those physical problems and induced pain. (Doc. 9-1, p. 416).

The ALJ found that the severity of symptoms and the degree of limitation reported are unsupported by the objective evidence of record. (Doc. 9-1, p. 25).  The ALJ gave great weight to the opinions of the state agency Disability Determination Services consultants that Garner could perform light work and "also mental limits," because their opinions were consistent with the record. (Doc. 9-1, p. 27).  He gave great weight to Dr. Whelan's consultative examination, as he was an examining source, his opinion related to his specialty, and his opinion was supported with explanation. (Doc. 9-1, p. 27).  The ALJ noted that Dr. Whelan opined that Garner's depression was mild to moderate in severity and her primary limitations appeared to be her physical problems. (Doc. 9-1, p. 27).  The ALJ gave partial weight to Dr. Darrell Blaylock's consultative examination, as he was an examining source.  (Doc. 9-1, p. 27).  The ALJ further noted that Dr. Blaylock opined Garner might be having some

difficulty and she should be able to, if she was trainable, handle some simple tasks. (Doc. 9-1, p. 27).

Here, the ALJ's resolution of conflicting evidence in the record is entitled to considerable deference. Vaughn v. Colvin, 589 Fed.Appx. 238, 242 (5th Cir. 2014) (citing Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001)). The ALJ did not err in weighing the opinion of Coleman in his RFC assessment. The Court finds that the ALJ's RFC assessment is supported by substantial evidence.

D.   **The ALJ properly evaluated work history in assessing Garner's credibility.**

Garner asserts the ALJ erred by failing to consider Garner's exemplary work history in his credibility finding concerning her willingness to work.  (Doc. 12). Garner asserts that from 1996 until 2013, she earned consistent covered earnings for every quarter of the 68 work quarters prior to the onset of her disability. (Doc. 12). Garner argues her lengthy work history lends to her credibility, rather than detracts from it. (Doc. 12). Garner cites 20 C.F.R. § 404.1529(c)(3) and SSRs 96-8p and 96-7p, stating the ALJ is required to consider "evidence from attempts to work" as part of his credibility assessment. (Doc. 12).

Both 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) state that in evaluating symptoms, including pain, the ALJ "will consider all of the evidence presented, including information about *your prior work record,* your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons." (emphasis added).  Garner cites numerous out-of-circuit decisions, asserting that a claimant with a strong work

history should be given substantial credibility. (Doc. 12). This Court has previously rejected similar arguments, identifying no controlling Fifth Circuit cases requiring consideration of a "strong work history" to determine a plaintiff's credibility. See McGee v. Astrue, No. 2:10-cv-1826, 2012 WL 7456174, at *8 (W.D. La. Nov. 26, 2012). District courts in the circuit have rejected imposing such a bright-line requirement on an ALJ. Wetzel v. Berryhill, 5-17-CV-00364-RBF, 2018 WL 4664139, at *9 (W.D. Tex. Sept. 28, 2018). Moreover, a claimant's work history is but one factor to consider when evaluating plaintiff's symptoms, and is not a ground for reversal. See McGee, 2012 WL 7456174, at *8 (noting that the Fifth Circuit has not adopted the rule of law espoused in the Second and Third Circuits).

The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled. See Loya v. Heckler, 707 F.2d 211, 215 (5th Cir. 1983) (citing Laffoon v. Califano, 558 F.2d 253, 254-55 (5th Cir. 1977)); see also Dominguez v. Astrue, 286 Fed. Appx. 182, 186 (5th Cir. 2008). A factfinder's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence. Dominguez, 286 Fed. Appx. at 186 (citing Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990)). Hence, the law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints and articulate his reasons for rejecting any subjective complaints. See Falco, 27 F.3d at 163-64.

The record shows the ALJ considered Garner's work history. The ALJ at step one noted that Garner's work activity was taken into consideration in the ultimate outcome of her claim. (Doc. 9-1, p. 20). At step three of the evaluation, the ALJ noted Garner has worked at many jobs and some after the alleged onset date. (Doc. 9-1, p. 23). In determining Garner's RFC, the ALJ based his considerations on all symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence based on 20 C.F.R. 404.1529 and 416.929 and SSR 96-4p. (Doc. 9-1, p. 24). The ALJ also considered opinion evidence in accordance with 20 C.F.R. 404.1527 and 416.927 and SSRS 96-2p, 96-5p, 96-6p, and 06-3p. (Doc. 9-1, p. 24). The ALJ stated that:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record.

(Doc. 9-1, p. 25). The ALJ found Garner's allegations were partially supported by the evidence, but the severity of symptoms and degree of limitation reported were not supported by the objective evidence. (Doc. 9-1, p. 25).

The ALJ discussed that Garner has degenerative disc disease, osteoarthritis, and sciatica, but she has not required surgery. (Doc. 9-1, p. 25). He noted that Dr. Blaylock's consultative examinations showed good grip strength, normal range of motion, but a slight limp on the right. (Doc. 9-1, p. 25). However, Garner could squat and recover and get on her heals and toes. (Doc. 9-1, p. 25). The ALJ noted Garner had depression and anxiety but required no inpatient hospitalization for mental

impairment. (Doc. 9-1, p. 25). He further noted she received treatment through Life Help, which records showed a stable response to treatment. (Doc. 9-1, p. 25). The ALJ found that Garner could drive and do normal housework, and has worked at many jobs, some after the alleged onset date. (Doc. 9-1, p. 25). He noted she stated she does not like to be around people, but found this statement was not supported by her history or the level of treatment she has received. (Doc. 9-1, p. 25). The ALJ gave great weight to the opinions of the state agency Disability Determination Services consultants that Garner could perform light work and as to her mental limits, because he found their opinions consistent with the record as a whole. (Doc. 9-1, p. 27).

Here, the ALJ provided sufficient reasons and did consider Garner's work history in assessing Garner's credibility. The ALJ's credibility determination is supported by substantial evidence.

## III. <u>Conclusion</u>

Because the ALJ applied appropriate legal standards and the ALJ's findings are based on substantial evidence in the record, IT IS RECOMMENDED that the final decision of the Commissioner be AFFIRMED and that Garner's appeal be DENIED and DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections

within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this ___19th___ day of February, 2019.

Joseph H.L. Perez-Montes
United States Magistrate Judge

35